Can it please the Court, my name is Steve Forrester and on behalf of Officer Clift and the City of Kent, this is our appeal of a denial of a motion for qualified immunity. The review is de novo. I want to turn immediately to the facts, which I think are undisputed, these facts. And that is... When you say you think, are they disputed? I don't think they're disputed. I say I think because the appellees have made a big to-do about what's disputed and what's not. Well, what did the district court say about it? About disputed facts? Mm-hmm. I don't know exactly what the district court said about disputed facts. Took a certain set of facts that had been quoted in the briefing and went forward. What I'm saying is, Your Honor, is I think the following facts, I didn't mean to make it sound like every single fact is undisputed, but the key facts for the purposes of our appeal... Is that what you're telling me? Yes. What I'm saying is, for example, the district court, I think, and the appellees use immaterial facts to try to raise issues of fact. But the point is, the undisputed facts are, this happened at midnight, this was a parking lot, the officer knew there had been a stolen car in before. It's dark out, of course, he comes in, he discovers another stolen car, the car that is the subject of this matter. He then waits to see if the people or person who stole the car comes back. When those people jump into the car, he comes out behind the car, flashes his flashlight in the back window of the car. There is recognition from inside the car. But now... Now, that's disputed. That's disputed. It is? It's not disputed. Mr. Tubar admits that there was a light behind, he looked back, and as Moorhead says in her deposition, as I'm negotiating to go forward, I see a light beaming in. So they knew he was back there. They didn't know it was a police officer. They knew someone with a flashlight. They didn't know it was a police officer. That's what the factual disputes about. And there was also a small rat-trap device under one of the tires at this point. That's correct, Your Honor. Which is an undisputed fact. I believe it is. Because the reason I'm really being careful about this is that it seems to me that in order for us to have jurisdiction in this matter, we give to Tubar every benefit of the doubt as to the facts. All of the facts, in order to even have this in front of us jurisdictionally, so that we can make this decision as to immunity prior to us having a decision made for you. And in this instance, it was not made for you. It was made for Tubar. And therefore, in order for you to bring this now, having a summary judgment declined in front of us, we give them every benefit of the doubt. Every way that they see it. And that's what we look at before we can get to where you want us to go. Or otherwise, I can't have jurisdiction. And I send it back to you. My answer is yes, but. That's an important but. That is a true statement, Your Honor, for relevant, admissible, and material facts. Yes. Not every single fact that they throw up. Well, I understand that. But relevant and admissible is one of those things which I don't think you should concentrate so much on, as what facts there are so that whatever facts they throw about, because you can argue about relevant and admissible, whatever facts they throw up, I win in it nonetheless. That's where we are. I agree, Your Honor. And that's why I'm trying to recite. What this is leading to is, after the flashlight, there is some recognition from the back, from the car, so that the officer knows that they know he's there. In other words, he can see them looking back. They know he's there. He knows they know. That's not disputed. The car does not stop. It starts to back up. He starts backing up. It makes its U-turn. It gets to a point where it's undisputed. It turns towards him. But the timing is how long it turns towards him. And that's what I want to ask. That is in dispute, I guess. Well, whether it turns towards him for a millisecond or longer, the exact amount of time it turns towards him is disputed. That it turned towards him is not disputed. Okay. I see my point. And here's the next crucial place where I want to stop. At that point where it turns towards him, under their facts, Officer Clift has about three seconds before he's hit, if it continues to go straight at him. Under their facts, it's three seconds. So in their facts, they didn't even get close to the man with the flashlight. Under their facts, he was still three seconds from being hit. I'm just suggesting that I have to look all the way through what the situation is, how close, how it is. I have Morehouse saying they didn't even get close to the man with the flashlight. They did not even believe he had any reason to be afraid. They did not even believe he had any reason to worry. But that's part of the issue here is, as through the eyes of a reasonable police officer, when a vehicle's traveling at undisputed at least 10 miles an hour at 15 feet per second, perhaps as much as 15 miles and 22 feet per second, he has three seconds to decide, he being a reasonable police officer, facing a car that has just turned towards him. He has three seconds to decide if it's a danger, to do something about it if it is a danger, to actually execute what he's going to do to stop doing it. Well, it's just taken me longer than three seconds to explain what he has to do. Well, counsel, the district court said that the parties dispute how long this was, and then there's a dispute as to how fast the car was traveling. All those things are quite material. Yes, Your Honor, that's what I'm saying. The three seconds I mentioned, we think it was less than three seconds. The three seconds are their facts. The 10 miles an hour and 15 feet per second, that's their facts. Our facts in the district court, our facts are 15 miles an hour and 22 feet per second. So what I'm saying is the crucial facts for the purposes of this motion, we are saying we agree for the purpose of this motion, it's the three seconds they want to talk about, we agree that it's the 10 miles an hour that they want to talk about. So that's what I'm saying. We are deferring to those facts for the purposes of this motion. Well, where does the six miles an hour come in? The six? Uh-huh. The only thing I think you're referring to is there. According to Plaintiff's expert, by the time the third shot was fired, the Kia was moving at about six miles per hour. Right, that's when it's almost to a stop. I'm talking about when it turns and faces him. Well, that may not be the material point where the third shot is really the contention. Yes, Your Honor, I'd be happy to address the third shot. The third shot occurs, even under their facts, within about three seconds. Under our facts, you recall from the record, one of the other police officers showed that he heard three shots, and he heard them all within two seconds, he said. Officer Clift, this all happened very quickly for him. He doesn't remember how long it took. It seemed like it was a second. But the point is, this is all unfolding in front of Officer Clift like that. But now the district court says the plaintiff argues that Defendant Clift was never in danger and that none of the three shots was reasonable. Plaintiff further argues that regardless of the reasonableness of the first two shots, the third shot was unreasonable under the circumstances because the gap between shots, two and three, and because of the clearly nonthreatening position of the car at the time the third shot was fired. So this is very fact-based, and we're looking at it in terms of the facts that the plaintiff has alleged. Yeah, but, Your Honor, the quote there about never thought he was in danger, it goes to exactly what we feel is the problem with the district court's decision. It is looking at in his head instead of what an objectively reasonable officer would be seeing. And that's based in part on Mr. Van Blaricombe, whose declaration we have moved to strike, where he said, well, this officer wasn't afraid for his life. He was just trying to shoot these people and stop them. Well, that's, first of all, wrong, but we moved to strike that, and it does go to the mental intent. We're saying the test under case law is whether it is objectively reasonable. Well, the objective reasonableness depends very much on the facts. I agree, and that's why we're giving them the facts that are in dispute, and it still ends up being three seconds that he's got to decide what to do and do it. At the time the third shot was fired, do we know, was the car heading towards the officer? By the time the third shot was fired, I believe. What was the direction of the car? Was it aiming right at the officer? No, by the third shot, it had veered off. But again, and this is the testimony we have submitted from an expert on the psychomotor and human performance issues, he can't simultaneously, it takes less than a half a second for that car to change directions and to go from something that is a threat to not a threat, he can't in one millisecond shut off what he's doing. And there's no dispute. We have submitted the evidence of an expert from the city of Seattle. They don't dispute that. Yeah, I'm familiar with this psychomotor and human performance stuff. It doesn't change my understanding. That is just, oh, well, summary judgment. It should be denied and we ought to have a trial, which you're telling us it should not be denied. You're saying I win on their facts. I win on everything that they suggest. And if I start arguing about whether reasonable interpretation or relevant, then I'm trying to throw out some of their facts, which might be something that they could get in and trial, and therefore you should rule on something that they might be able to put in front of the jury. My worry, and that's why I was giving you questions before, I went through and put exactly what their facts were as best I could, which I thought you were trying to do. And I tried to put them every bit that they said, regardless of whether I thought reasonable or irrelevant, such that one could make a decision based on those facts. That being the only way I think I get it on summary judgment in order to help with the immunity problem. Can I suggest that there has been a constitutional violation on those facts? And then we didn't even get to the point, well, is it something the policeman would have known about? The district court didn't even get to that. All they're talking about is the constitutional violation. That's the only thing that I have in front of me right now. The district court didn't even talk about the second part of the problem. It did, Your Honor, in the rest of the opinion. It talks about clearly established, if that's what you're. I understand. But clearly established was really not the reason for this decision. The decision was on, hey, we do think, we think that based on the facts there's a violation of the Fourth Amendment. That was the, that's the decision of the district court. But the process is, even if that's true, you have to take the next step and look at whether it's clearly established. And I think the court did it, in my opinion, did it wrong, but did it nevertheless. But I, what I'm saying is the facts, they're the undisputed facts, which I've just said, and we've given them the facts that they think are their facts in terms of the three seconds and so forth. Mr. Cooper, you want us to take a look about what your expert said about his ability to, for the brain to digest all of this? Yes. And that's why I think one of the things the district court did wrong, it took the second and the third shot, which even under their facts couldn't have occurred, the gap or the pause couldn't have been more than a second, and made it a separate use of force under the Hopkins case. That's directly contrary to the case law that says, in this context, the police aren't supposed to be judged by milliseconds. The courts aren't supposed to carve up their behavior in milliseconds. This is all occurring within about three seconds. And the district court says, well, I'm going to look at the third shot as a separate use of force based on the Hopkins case. Well, the Hopkins case involved a use of force in a parking lot, and then a separate use of force across the street in another parking lot, separated by a minute, not two shots separated by, at best under their version, a second, and separated by the car moving several feet. I mean, the idea that we can chop it. The car had slowed down. It was slowing down. The gun was breaking because of the shots. In fact, it's undisputed. It's admitted, page 15 of their brief, that the first. I mean, as you said earlier, or as I said, it is also undisputed that the car was not facing the officer at the time of the third shot. At the time the third shot left the gun, yes. That's what I'm saying. He still perceives it as a threat, but by the time the bullet leaves the gun, it has moved, which is, again, why the cases talk about not dissecting this into milliseconds. And let me get to the other question, the other issue that's been raised. If you peel away, if you look at objective reasonableness and what he's facing in this parking lot or what he or any reasonable officer would see, you peel away a lot of the stuff that they're talking about, oh, about whether he was going through a divorce or any of this stuff that was going on outside of that parking lot that night. It just doesn't matter. And then they want to talk about, well, it was a predictable path. He should have known it was going to take this great big sweeping turn. Well, the district court said taking all of the plaintiff's allegations is true. Defendant Clift was never in danger. And even if Defendant Clift acted reasonably by firing the first and second shots, the vehicle certainly was no longer a threat when Defendant Clift paused, aimed, and fired the first shot. And goes on to say a jury could find that Defendant Clift was not reasonable. So it seems to me that there are at least some facts in dispute which make it clear that we don't have jurisdiction. Well, but even Saussure says if there are facts in dispute, if it's still clearly or not clearly established, that doesn't prevent summary judgment. But I guess I want to go back here on it. Well, it's clearly established if someone uses deadly force when he wasn't in a situation where it was called for, that that law was clearly established. Well, stated like that, yes, it is wrong. That's the case that the plaintiff is making to us. Well, but even the court and the plaintiffs want to rely on the Acosta case, which doesn't, according to another district court, establish anything. So in other words, the analysis has to go beyond just saying, well, you can't use unreasonable force if it's inappropriate. It has to be down to a certain level of specificity that would give the officer reasonable notice that what he's doing is illegal. And the court and the appellees claim that case is Acosta v. San Francisco, which was a jury verdict. And the only issue there was whether the car was even moving at all, much less moving and just barely starting to roll, according to the opinion. Well, here it's undisputed that he was going at least, that she was going at least 10 miles an hour, 15 feet per second. She had been driving the car for quite some time, or at least several seconds before it turned to him. So the idea that Acosta was backing up, she backed up and then she went forward. She had to back up and then go forward. Correct. What I'm saying is the notion that Acosta would give him, well, let's assume for the sake of argument, the day before this incident the officer read Acosta. It couldn't possibly be said that that would give him fair notice that what was going to happen that night was in violation of Acosta. And, again, this district judge, two years after the incident, says Acosta controls, I make that three years after the incident, two years after the incident, a district judge in Alaska says Acosta doesn't control anything. It doesn't show anything in this context. Let's look at it the way I think the plaintiff was looking at it. This was a stolen car. Yes. He had the license plate. He saw the people. He never needed to get in the pathway of the car, and he apparently, according to the plaintiffs, really didn't. So he wasn't, under their theory, really in danger. And we know that deadly force is not indicated when all you're doing is tracking a stolen car. Well, but the stolen car becomes a vehicle that's capable of running him over. And, again, he didn't. But the safety was never in danger. Well, but, again, that's based on their expert who's looking at, he could never believe it in his own mind, not looking at. Their own expert said if it kept going straight, there would have been a self-defense issue. He's just saying, well, in the officer's mind, as though he can read the officer's mind. But, again, what's in his mind is not what's relevant. It's what objectively reasonable facts he had before him. I have about a minute left, and I will defer if that's okay. You want to reserve it? Okay, that's fine. Thank you. Please report. My name is Tim Ford. I represent McTubar. The difficulty with this case is it's kind of a square peg in a round hole because the test is objectively reasonable, Officer, and this officer was way beyond reasonable. What happened here, when this officer encountered my client, he was in the bushes having an adulterous telephone call to the woman that he was having an affair with, and his marriage was breaking up, and he was in trouble with the department. Because of that, the people who he was supposed to be staking the car out from got into the car and started to drive away, and the car was moving before he was able to make a call to the people he was supposed to call. He had to hang up from his girlfriend and then make the call to the other police officers and then run out into the parking lot, and by that time they were moving. And that's a big mistake. Their own expert, Mr. Fountain, says you don't want that to happen. Everybody agrees. You want to get them while they're still in the car. And he had already done it. Get by the mic, Mr. Ford. I'm sorry. Remember, all this story was put together starting 12 days afterwards. He didn't have to say what had happened for 12 days, and none of it sent a fax from a lawyer. This has all been created by lawyers. What actually happened was, this is his drawing. This is what he drew for the internal investigations. He walked out here. He went back here. This is his ex. That's where he got to. He said between 15 and 50 feet from the car. The car is moving and backing out. Then the car goes in this path, headed out the parking lot. That's where they're going. They're going. They're driving. I suppose Mr. Tubar and Ms. Morehouse testified. Out of the parking lot in a normal fashion, just like anybody drives out of a parking lot. They made the U-turn, and they headed for the exit. He ran over here. This is his why. He wrote this why down. He ran in front of the car and started shooting to stop them. And when they asked him in the interview, they said, why didn't you step up on the curb here? He said, just doing my job, trying to stop them. He ran in front of the car. The car never turned toward him. This whole idea of turning toward was made up 12 days after this incident happened. If you look at the actual path that the car cut because of this mark that was left because of the flat tire, it drove straight toward. This is the exit out here. It's headed straight toward the exit. He runs in front of here, and he starts shooting it. And she turns away from him. She never turns toward him because he's out here. This is where the cartridges are. They try to say, oh, the cartridges don't really mean anything, even though they tested them themselves. And he says, oh, I kicked one of the cartridges away. Officer Clift said he kicked one of the cartridges away, trying to discount where they show he was shooting. He ran in front of that car, and the last shot he fired was from here. The car is headed that way, that way. At 6 miles an hour stopping, it stopped 2 1⁄2 feet after he shot it. And he goes, blam, through the window. Not milliseconds, not split seconds. A split second. This whole thing, yes, we agree. The testing shows, and this test that they have, where if you fire a gun as fast as you can, the officers instruct, fire the gun as fast as you can, and then when you say stop, stop. Average officer, 0.3 to 0.6 seconds. Well, stop. Well, that's a split second. I looked up split seconds. Split second means a fraction of a second, not several seconds. I have baseball players, little league baseball players, 42 feet away, as the pitchers mound, and the ball comes about 15, 55 miles an hour, the ones who throw fast. They have about 0.55 seconds to decide whether to swing or not. They do that quite regularly. They almost never wait 2 1⁄2 seconds after the ball is in the catcher's glove, and then swing. They don't make that mistake. Three seconds is, I happen to have another time and distance case, four feet per second is the average walking speed for a 60-year-old. Three seconds. When I came to this court today, dozens of cars turned left, and in the course of turning left from one street to another, they pointed right at me. And if they had headed straight ahead and gunned the engine, I would have been in danger. They didn't do that. That didn't happen. I wasn't afraid. And it was Officer Cliff. That's not what he was doing. He was trying to stop and trying to make up for the big mistake that he'd made. Here he was, just having come off of a suspension, an administrative suspension, facing a protective order from another police officer that's going to cost him his job because he'll have to turn in his firearm. And he's called in this stolen car, and while he's talking to his girlfriend, the people come out and they're getting away. He's got a terrible problem. He's panicking. He's not a reasonable officer. And he did what Officer Fountain, their expert, says no officer could do. I asked Officer Fountain what he said. Look at his eyes. He ran from there to there, directly in the path of the car. Actually, Officer Cliff says he came down there. This Y point, the cartridges were actually up here. He ran clear across the path, right where the car was obviously headed, leaving the parking lot in a normal fashion. And I said, well, isn't it obvious that he ran in front of the car to stop the car? And he said, no, he must have been trying to get away from the car. I said, get away from the car? The car was going like this, and the attorney could have just stood there. And I said, isn't it obvious he ran in front of the car to stop the car? He said, no reasonable officer would do that. He couldn't have done that. So they start with the assumption that he didn't do anything wrong, and then try and reason backwards. Well, the reasoning doesn't make any sense. And actually, it's interesting now, and finally in the reply brief, they've given up completely on this idea that there was a swerve. The swerve was the whole deal.  Not these lawyers, the union lawyers that got to talk with him for the 12 days after the incident before he turned in his report, and said, oh, that's what scared me. And then the Auburn police officers obligingly went out and altered the CAD diagram to show a swerve. And everybody has said, okay, the shots must have occurred after that swerve. Now they've said, no, the shots occurred before that swerve. So if that happens, then he had many seconds. Then the car was still up here. We've given them the benefit of the doubt on that. If the swerve happened after the shots, he shoots someone up there. He's clear down here. He's trying to stop the car. He's trying to do exactly what Garner v. Tennessee said he can't do. Counsel, let me turn you to a different issue. If we were to agree with you, should we dismiss this for lack of jurisdiction? Yes. Or is it so clear that we should just affirm the district court? Well, I think, I mean, technically I think it is a question of jurisdiction. We have moved to dismiss for lack of jurisdiction. I mean, there was a shadow of a legal argument here because of some question about whether a passenger was seized when the driver was shot. The trouble with this case was that Officer Cliff said I was trying to stop them, not just her, the driver. And so it was pretty clear he was trying to seize both people in the car. He said so to the interviewers who interviewed him for IIS. I'm sorry. Well, I'm just going to say there may be some peripheral kinds of issues, you know, about what he was doing on the phone and whatnot, other experts. But why can't you just look at the core facts, Judge Smith related them as you just related them, your version of what happened, and say on those facts he states a constitutional claim, if believed by a jury, and no reasonable officer would have fired those shots. No qualified immunity. He'd go to trial on the merits. Absolutely. That's what we want to do. Well, you just, in response to what Judge Fletcher said, you said dismiss this appeal. I mean, he goes back down to court and qualified immunity is still in play. I don't see how. There's not going to be another ruling on that. I certainly don't want qualified immunity. Qualified immunity is always on the table, even after a jury trial, because then what will happen is the district court can submit, you know, factual questions to the jury and ask the jury to resolve the factual disputes, and then say, ah-ha, you know. And I agree with you, Your Honor. And that is actually a difficulty in this circuit, because the law of the circuit does seem to suggest that it can be submitted to the jury. We always think that that's wrong. Oh, not the question, not the ultimate question, the facts.  The facts. The facts are determined. The facts are determined by the jury. So I agree it would be more efficient at this point, too, for this Court to rule on the merits of the qualified immunity ruling. The problem I have, and it's a disturbing one, is that in this kind of litigation now, the ability to construct some sort of argument for qualified immunity and then take it up on appeal, we tried twice to dismiss this case. And really the only – as I was saying earlier, the only thing that appeared to be a shadow of a legal argument ever was this question of passenger seizure. And the Supreme Court of the United States ruled four square on that last year and then said that all 11 circuits were. And so we said, okay, shouldn't that end it? It still didn't end it. And here we've been, you know, almost two years now. No, I know. And so it's very discouraging to not – and that's why I think the jurisdictional question – I wish it would have been reached earlier, and I wish the case would have been disposed of that way. Since we're here and we've had all this Court's time taken up on it, the defendants have successfully resisted dismissals on jurisdiction, and perhaps the best way to proceed is to get a ruling on the merits so we don't have questions, because they will be raised. In our Thomas case, which is quite recent, we say that where the district court denies summary judgment based on qualified immunity, because material facts remain in dispute, we lack jurisdiction. Now, what did the district court say? It said that there were facts in dispute. It said on our version, just as you read, Your Honor, that he was either never in danger or certainly never in danger of the last shot. So, you know, I've been kind of struggling whether we could do it on the merits. It seems to me that we can't, that our rule is that if the district court finds material facts in dispute, we have no jurisdiction. So, anyway, that's the critical issue to me. But Judge Paez makes a great point, and that is this. Yes, the district court is going to find that there are disputed issues of fact, and they're going to deny summary judgment. Then they appeal. Your suggestion is, in those appeals, we take every benefit of the doubt as to the way you put it, and then we determine if there's immunity. That's the only way we get jurisdiction. Now, if we come to that decision, and we find there's a violation of a constitutional right, and we further find that police officers wouldn't behave in that manner in any event, which I, you know, I read the decision, and I'm not sure how much the judge got over that, but we're going to have to decide it. Now, if we determine all of that at that point in time, we're not going to be faced with immunity again. As you said it, if we dismiss because there's undisputed issues, we do not decide this issue. This judge can suggest to the jury that, and make some decisions on immunity as to the reasonable officer's determination on the second issue as to what goes on in this case, and this case goes away on immunity grounds based on what this judge finds. Now, that's what I, that's why I asked those questions. That's why I was glad Judge Paez was asking them. And that's why Judge Fletcher's interested in it, because we've got to know where you are. On the first point, Judge, I think you're right. I read it, and I think it was in the Vaughn case from the 11th Circuit. There was an interesting line there from a couple of 11th Circuits that said there really aren't disputed facts on qualified immunity. It's only one set of facts. It's only the plaintiff's facts. I think that's very much the same as you're saying, and I would agree with that. As to what the appropriate disposition is here, I'm not in a very good position to say it shouldn't be dismissed for lack of jurisdiction, since I've argued that three times. I've lost it twice, but it's been put forward to this panel. I do, would note, interestingly, that defendants have, I guess, discretionarily brought the city of Kent here also, which is not a qualified immunity appeal, on the grounds that this case involves some intertwined issues of constitutional law. So perhaps the court would have jurisdiction over that. Well, I don't see any particular intertwining in the legal sense. Where this comes from, Judge Fletcher, and we're seeing this quite a lot in these cases now since the Saussure case, because Saussure said you do the constitutional question first, then the clearly established question, and so what the municipalities routinely do now is this, that they say, well, our argument on Saussure is qualified immunity because there's no constitutional violation. If there's no constitutional violation, the city's not liable either. Therefore, we want to come up as well. In this case, they have done that, and so the case is before the court in two different postures. We certainly would feel disappointed if there weren't some movement forward in this case after this length of time, but I would submit to the court that it should be disposed of one way or the other in a way that allows us to take this case to trial. No further questions? Thank you. There is jurisdiction. This Court has denied the motion twice. These are, you know, maybe you don't think they're the strongest issues, but there are legal issues. It clearly establishes by definition a legal issue, so there certainly is jurisdiction to hear this. Officer Cliff. But it is possible that where there are facts that are so material in such a dispute that we just can't resolve the case on qualified immunity. That may be. I'm just saying. You're saying this is not that case. I'm saying if you look at their facts. Well, if you look at his facts, you take his facts that he gave them and you say that that's what's alleged and that's what's established in the record, his version, he's taking his version, and you listen to him, you know, you've got a pretty tough case on qualified immunity. In my response to Justice's questions, that's where I got to relevant, admissible, and material. The fact that he's going through a divorce. When I was speaking, I said, you know, there is some stuff you've just got to get rid of here, but you get to the material part of the facts, and you take what counsel just went through as their version of what happened, where he was and where he was moving. You're running stuff. You take their version. I understand that, Your Honor. And that's what you don't want to do. No. So when you don't want to take their version and you create a disputed fact, then you're right. Then it goes back to the trial court. No, I'm just saying you take their version of things that are admissible and relevant and material. That's all. I'm not disputing that you have to take their version, but not every single fact they put up that doesn't have any support for it. I would nevertheless ask that the court review this report. Thank you. Thank you. The matter will be submitted. And we're through for today.
judges: Fletcher, Paez, Smith